1  SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
2
   Kurt Ramlo (Cal. Bar No. 166856)
3  300 South Grand Avenue
   Suite 3400
4  Los Angeles, California 90071-3144
   Telephone: (213) 687-5000
5  Facsimile: (213) 687-5600
   Email: kramlo@skadden.com
6
   J. Gregory St. Clair (applicant for *pro hac vice* admission)
7  Shawn P. Naunton (applicant for *pro hac vice* admission)
   Four Times Square
8  New York, New York 10036-6522
   Telephone: (212) 735-3000
9
   Edward J. Meehan (applicant for *pro hac vice* admission)
10 1440 New York Avenue, NW
   Washington, DC 20005-2111
11 Telephone: (202) 371-7000

12 Attorneys for the Plaintiff

13              IN THE UNITED STATES DISTRICT COURT **MHP**
             FOR THE NORTHERN DISTRICT OF CALIFORNIA

14 - - - - - - - - - - - - - - - - - - - - - - - - -x

15 FLIGHTLEASE HOLDINGS (GUERNSEY) :  **C 05 4182**
   LIMITED, by its Joint Liquidators    : Case No.
16 Stephen John Akers and Nick Stuart Wood, :
   derivatively and on behalf of Nominal :
17 Defendant GATX Flightlease Aircraft  :
   Company Limited,                     :  SHAREHOLDER
18                                       :  DERIVATIVE COMPLAINT
                  Plaintiff,             :
19                                       :
              - against -                :
20                                       :  DEMAND FOR JURY TRIAL
   JAMES MORRIS, ALAN M. REINKE,         :
21 GATX THIRD AIRCRAFT                   :
   CORPORATION, and GATX FINANCIAL       :
22 CORPORATION,                          :
                                         :
23              Defendants,              :
                                         :
24            - and -                    :
                                         :
25 GATX FLIGHTLEASE AIRCRAFT             :
   COMPANY LIMITED,                      :
26                                       :
              Nominal Defendant.         :
27 - - - - - - - - - - - - - - - - - - - - - - - - -x

28

Shareholder Derivative Complaint and Demand for Jury Trial

Plaintiff Flightlease Holdings (Guernsey) Limited ("Flightlease"), by Stephen John Akers and Nick Stuart Wood of Grant Thornton UK LLP (the "Joint Liquidators"), joint liquidators in Flightlease's voluntary liquidation supervised by the Royal Court of Guernsey, and by their undersigned attorneys, brings this action derivatively on behalf of nominal defendant GATX Flightlease Aircraft Company Limited ("GFAC"), and alleges upon personal knowledge as to its own acts and as to all other matters upon information and belief as follows:

## SUMMARY OF ACTION

1.    This is a shareholder's derivative action brought by Plaintiff Flightlease, by and through its Joint Liquidators.  Flightlease is now and has been at all relevant times a shareholder of GFAC.

2.    Flightlease brings this action in the name of and for the benefit of GFAC against GFAC directors James Morris and Alan M. Reinke, for breach of their fiduciary duties to GFAC; against GATX Third Aircraft Corporation ("GATX") and GATX Financial Corporation ("GFC"), for knowingly and/or dishonestly assisting defendants Morris and Reinke in the breach of their fiduciary duties to GFAC; and against GATX, for unjust enrichment.  In addition to the aforementioned breaches of fiduciary duties and unjust enrichment, all defendants also conspired to deprive GFAC of assets and to improperly advance the interests of GATX and GFC at the expense of GFAC.

3.    Flightlease seeks to recover damages caused by defendants Morris and Reinke's breaches of their fiduciary duties to GFAC, as knowingly and/or dishonestly assisted by defendants GATX and GFC, and by all defendants' conspiracy to misappropriate GFAC's assets. As a result of defendants' abuse of their fiduciary obligations, GFAC's contractual partner, Airbus S.A.S., f/k/a Airbus Industrie ("Airbus"), breached an aircraft purchase agreement between GFAC and Airbus dated as of September 16, 1999 (the "Al Purchase Agreement"), and wrongfully

retained approximately $227.6 million in predelivery payments ("PDPs") that GFAC paid to Airbus for aircraft that were never delivered under the Agreement.

4.     By way of background, Flightlease and GATX each hold a 50% equity interest in GFAC.  Pursuant to the GFAC members' agreement, Flightlease is entitled to nominate 2 directors (referred to as "A Directors") and GATX is entitled to nominate 2 directors (referred to as "B Directors") to GFAC's 4-person board of directors.  The GATX-appointed B Directors of GFAC currently are, and at all relevant times have been, defendants Morris and Reinke. Defendants Morris and Reinke are employed by GFC, GATX's direct parent.  There currently are no A Directors of GFAC.

5.     In early October 2001, defendant Morris, with the knowledge and acquiescence of defendant Reinke, helped negotiate a new, unilateral aircraft purchase contract between GATX, GFC and Airbus.  In anticipation of entering into this new arrangement, these parties signed an agreement in principle on October 9, 2001 (the "October 9 Agreement").  The purchase contract between GATX, GFC and Airbus was thereafter executed on October 17, 2001 (the "October 17 Agreement," and, together with the October 9 Agreement, the "October Agreements").  In connection with helping to bring about this new arrangement, defendants Morris and Reinke acted in utter disregard of their fiduciary duties to GFAC and at the express direction and instruction of GFC (their employer) and GATX.  Defendant Morris was directly supervised during his participation in these negotiations by Mr. Stephen Moulton, a fellow employee of GFC and, upon information and belief, Assistant Secretary of GFAC.  Throughout this time defendants Morris and Reinke, by their own admission, considered only GATX's interests and never considered the best interests of GFAC, as separate and distinct from the interests of GATX.

6.     By the October Agreements, Airbus retained certain PDPs paid by GFAC under the AI Purchase Agreement.  In the October 9 Agreement, Airbus, GATX and GFC also agreed to block any attempt by GFAC to protect its rights under the AI Purchase Agreement and

applicable law.  Subsequently, all defendants took steps to conceal their agreement to these terms.

As a result, Flightlease did not learn that GATX and GFC had contractually agreed to obstruct

GFAC's pursuit of its claims against Airbus until approximately September 2004.

7.    Two days after execution of the October 9 Agreement, on October 11, 2001,

Airbus purported to terminate the AI Purchase Agreement and announced its intention to retain all

of the approximately $227.6 million in PDPs then paid by GFAC under the Agreement.  Airbus

later conceded that its purported termination violated the express terms of the AI Purchase

Agreement.

8.    GFAC has suffered damages as a consequence of defendants Morris and

Reinke's breaches of their fiduciary duties of reasonable care, loyalty and good faith, as knowingly

and/or dishonestly assisted by defendants GATX and GFC; as a consequence of all defendants'

conspiracy; and as a consequence of GATX's unjust enrichment of itself at the expense of GFAC.

Flightlease brings this action so that defendants will be held accountable for their mismanagement

and faithless stewardship of GFAC.

## THE PARTIES

9.    Plaintiff Flightlease was formerly engaged in the business of owning and

leasing aircraft.  Flightlease and seven of its subsidiaries[1] commenced voluntary liquidation

proceedings in Guernsey in January 2004.  Flightlease is a wholly owned subsidiary of Flightlease

A.G. ("FLAG"), a Swiss company and member of the SAir Group.[2]

10.    The Joint Liquidators of Flightlease are partners of Grant Thornton UK LLP,

a leading financial and business adviser.  It has registered offices located at Grant Thornton House,

Melton Street, Euston Square, London NW1 2EP, United Kingdom.  The Joint Liquidators were

---

[1]    An eighth Flightlease subsidiary is in voluntary liquidation in Bermuda.  Flightlease has eleven subsidiaries in total.

[2]    SAir Group, the ultimate parent company of FLAG and Flightlease, was also the ultimate parent company of Swiss Air Transport Company Limited, Switzerland's venerable national air carrier.

certified as Joint Liquidators of Flightlease by Order of the Royal Court of Guernsey, Ordinary Court, dated May 5, 2004.

11.     Nominal Defendant GFAC is a Cayman Islands joint venture company with its registered office at the offices of Walkers SPV Limited, Walker House, Mary Street, P.O. Box 908 GT, Grand Cayman, Cayman Islands.  GFAC has no employees and ceased operations in October 2001.  The subject matter of the business for which the company was formed has ceased to exist.

12.     Defendant GATX is a Delaware corporation with its principal place of business, upon information and belief, at Four Embarcadero Center, Suite 2200, San Francisco, California 94111.  GATX engages in the business of owning and leasing aircraft from its San Francisco headquarters.  GATX is a wholly owned subsidiary of GFC.

13.     Defendant GFC is a Delaware corporation with offices, upon information and belief, at Four Embarcadero Center, Suite 2200, San Francisco, California 94111.  GFC specializes in railcar, locomotive, and aircraft operating leasing.

14.     Defendant James Morris is an individual who, upon information and belief, resides in and is a citizen of the State of California.  His address is 16 Upper Cecilia Way, Belvedere Tiburon, California 94920-2188.  Morris was appointed by GATX to the GFAC board of directors on or about September 9, 1999.  In addition to serving as a GFAC B Director, Morris currently is managing director of GATX Air, a division of GFC.  In those positions, Morris owes fiduciary duties to both GFAC and GFC.  Upon information and belief, Morris has been an employee of GFC throughout his tenure as a B Director of GFAC.

15.     Defendant Alan M. Reinke is an individual who, upon information and belief, resides in and is a citizen of the State of California.  His address is 151 Tunnel Road, Berkeley, California 94705-2840.  Reinke was appointed by GATX to the GFAC board of directors on or about January 16, 2001.  Prior to his appointment as a B Director, Reinke served as Assistant

1  Secretary of GFAC.  Upon information and belief, Reinke has been an employee of GFC

2  throughout his tenure as both Assistant Secretary of GFAC and B Director of GFAC.

3      16.    Airbus is a societe par actions simplifiee created and existing under French

4  law with its registered office at 1 Rond Point, Maurice Bellonte, 31700 Blagnac-Cedex, France.

5  Airbus is registered with the Toulouse Registre du Commerce under the commercial registration

6  number 383 474 814 RCS Toulouse.

7

8                        **JURISDICTION AND VENUE**

9      17.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332 in that there is

10  complete diversity between plaintiff and each of the defendants herein and the amount in

11  controversy exceeds $75,000.  The Court can exercise in personam jurisdiction over defendants

12  Morris and Reinke because each is a resident in and is a citizen of the State of California.  The

13  Court can exercise in personam jurisdiction over defendants GATX and GFC because each has

14  offices in and/or conducts business in the State of California.

15

16      18.    Venue properly lies in this Court pursuant to 28 U.S.C. § 1391(a) because

17  defendants Morris and Reinke reside in this district and defendants GATX and GFC have offices in

18  and/or conduct business in this district.

19      19.    The claims at issue in this Complaint are governed by the law of the Cayman

20  Islands.

21

22                        **INTRADISTRICT ASSIGNMENT**

23      20.    The San Francisco Division of the District Court for the Northern District of

24  California is the proper intradistrict assignment pursuant to Civil L.R. 3-2(c) because, upon

25  information and belief, a substantial part of the events or omissions which give rise to the claims

26  asserted herein occurred in the City and County of San Francisco.

27

28

---

Shareholder Derivative Complaint and Demand for Jury Trial

## FACTUAL BACKGROUND

**The Joint Venture**

21.    On August 25, 1998, FLAG and GFC entered into a joint venture and co-operation agreement (the "Joint Venture Agreement").  The purpose of the joint venture was to achieve marketing, management and operational synergies in relation to aircraft.  Specifically, the joint venture sought to form a management company to be owned equally by FLAG and GFC that would identify and invest in new and used aircraft.

22.    Pursuant to the Joint Venture Agreement, FLAG and GFC formed GATX Flightlease Management GmbH (the "Manager"), a company incorporated in Switzerland to carry on business as manager of the joint venture from premises in Zurich.

23.    FLAG and GFC also negotiated the AI Purchase Agreement in order to purchase a number of aircraft from Airbus.  Pursuant to the terms of the AI Purchase Agreement, GFAC was formed to act as the purchaser.

24.    On September 16, 1999, Flightlease, GATX and the Manager entered into a members' agreement in relation to GFAC  (the "Members' Agreement"), which set forth the terms of the equity investment made in GFAC by Flightlease and GATX.  The Members' Agreement was later amended and restated on January 31, 2001 and June 28, 2001.

25.    Pursuant to the terms of the Members' Agreement, Flightlease and GATX each hold a 50% equity interest in GFAC.  Flightlease and GATX each are entitled to nominate 2 directors to GFAC's 4-person board of directors (referred to as "A Directors" and "B Directors," respectively).  The Members' Agreement also provides that, in the event of the dissolution of GFAC, each Member should profit equally from the allocation of the assets of GFAC.

**The AI Purchase Agreement**

26.     On September 16, 1999, GFAC also entered into the AI Purchase Agreement with Airbus. Under the AI Purchase Agreement, Airbus agreed to sell and deliver and GFAC agreed to buy 38 narrow- and wide-body Airbus aircraft pursuant to the terms of the Agreement.

27.     The parties later negotiated changes to the number, models, and delivery dates of the aircraft to be delivered under the AI Purchase Agreement. By 2001, GFAC had agreed to purchase 41 narrow- and wide-body aircraft to be delivered beginning on July 6, 2001.

28.     Under the AI Purchase Agreement, GFAC was required to make periodic deposits, or predelivery payments ("PDPs"), for each aircraft on order. Both Flightlease and GATX made periodic contributions to GFAC from time to time to cover such PDPs.

29.     Pursuant to Section 5 of the AI Purchase Agreement, GFAC was to pay for each aircraft by paying (i) a deposit of either $250,000 or $500,000, depending on the model of the airplane; (ii) PDPs amounting to 20% of the Predelivery Payment Reference Price (as defined) for each aircraft, of which 2% was payable on signature of the AI Purchase Agreement and the balance was payable by four installments on the first day of certain months prior to the delivery month for the aircraft; and (iii) the balance of the Final Price (as defined) on or before the Delivery Date (as defined).

30.     Pursuant to Section 20.2 of the AI Purchase Agreement, if GFAC failed to make any PDP within 15 business days of any notice of non-payment issued by Airbus, Airbus was entitled to terminate the AI Purchase Agreement with respect to all undelivered aircraft. In the event GFAC provided Airbus with adequate assurances within the 15 business day grace period that it would make the required payment, the grace period would be extended an additional 10 days in order to allow GFAC to make the payment.

31.     Pursuant to Section 20.5.4 of the AI Purchase Agreement, in the event of a valid termination by Airbus, Airbus had the right to "retain, as part of the damages for breach and

1  not as a penalty, an amount equal to all predelivery payments, deposits, option fees and any other

2  monies paid."

3  **Events of May 2001 – October 2001**

4          32.     By the end of May 2001, SAir Group, Flightlease's indirect parent, had

5  decided that the joint venture between FLAG and GFC was no longer in its interest.  SAir Group

6  wished to concentrate on its core activities, which did not include leasing aircraft to third parties.

7  On May 30, 2001, following discussions between representatives of SAir Group, Flightlease and

8  GATX, the representatives announced the companies had agreed that it was in their mutual best

9  interests to dissolve GFAC and to divide the assets, including the forthcoming deliveries under the

10  AI Purchase Agreement, in a fair and equitable participation, subject to internal approvals,

11  satisfactory documentation and to securing the cooperation of Airbus.

12          33.     The parties agreed in principle that (i) GATX would take delivery of the

13  model A318 airplanes due under the AI Purchase Agreement; (ii) Flightlease would take delivery

14  of the model A330 airplanes due under the Agreement; and (iii) GATX would take the early

15  deliveries of model A320 airplanes and Flightlease the later ones.

16          34.     In order to effectuate the decision to dissolve GFAC, on or about July 16,

17  2001, representatives of Flightlease (chairman of the board Dr. Hans Jorg Hunziker and Flightlease

18  director Peter Gysel) and representatives of GATX (defendant B Director James Morris and vice

19  president Michael Favier) prepared and signed a schedule of aircraft responsibility (the "July 16

20  Schedule"), setting out a proposed division of the 42 aircraft then ordered under the AI Purchase

21  Agreement.  Pursuant to the July 16 Schedule (i) GATX agreed to assume responsibility for 21

22  aircraft due to be delivered under the AI Purchase Agreement; (ii) Flightlease agreed to assume

23  responsibility for 20 aircraft due to be delivered under the Agreement; and (iii) one aircraft due to

24  be delivered under the Agreement was to be cancelled.

35.     On July 26, 2001, representatives of Airbus, SAir Group and GATX met in Maui to discuss the dissolution of GFAC.  At the meeting, representatives of Airbus and SAir Group signed a document (the "Maui Agreement") recording the outcome of their discussions.  The Maui Agreement states in pertinent part that "Airbus agrees in principle to the allocation of certain future aircraft deliveries between GATX and Flightlease (Swissair)."  A copy of the July 16 Schedule was appended to the Maui Agreement.

36.     Less than two months after the meeting in Maui, the September 11, 2001 terrorist attacks upon New York and Washington, D.C. caused a worldwide decline in passenger air travel.  On or about October 1, 2001, SAir Group president Dr. Mario Corti announced that SAir Group and FLAG were in financial difficulties. On October 3, 2001, the Swiss government granted SAir Group a CHF 450 million loan to enable it to resume and continue flights until October 28, 2001.  On October 5, 2001, SAir Group and FLAG were placed in a provisional debt restructuring moratorium by the Swiss courts.  Throughout October 2001, it was uncertain whether SAir Group and FLAG would be rescued so that they could continue their businesses.

37.     Nonetheless, at that time, Flightlease remained a substantial business in its own right and had obtained approximately 50% of its financing from sources outside SAir Group companies.  Indeed, on or about that time, Flightlease had paid up share capital of approximately $650 million; had obtained loan financing from SAir Group companies of approximately $394 million; and had obtained from banking syndicates, backed by export credit agencies, substantial lines of finance amounting to approximately $985 million.

**The Split Agreement**

38.     On the morning of October 3, 2001, upon information and belief, GATX vice president Michael Favier informed Erich Thurnherr of FLAG that payment by GFAC of PDPs due on October 1, 2001 should be put on hold until further notice.  Mr. Favier had spent the preceding week in Toulouse with, among others, defendant James Morris, attending meetings with

Airbus to discuss the creation of a new purchase agreement to replace GATX's participation in the AI Purchase Agreement.

39.    Also on or about October 3, 2001, Mr. Favier met Flightlease chairman Dr. Hans Jorg Hunziker and Flightlease director Peter Gysel in Zurich to conclude an agreement dissolving the GFAC joint venture, which had been the intention of Flightlease and GATX since about May 2001.

40.    On October 4, 2001, Flightlease and GATX executed an agreement (the "Split Agreement") that recorded their previous agreement to dissolve the GFAC joint venture and, as part of the dissolution, to split responsibility for the aircraft then ordered under the AI Purchase Agreement.  Under the Split Agreement, the aircraft then ordered by GFAC were allocated, with minor exceptions, as they had been in the July 16 Schedule.  Specifically, GATX assumed responsibility for 21 of the aircraft on order (most of which had earlier delivery dates, of which two had already been delivered), and Flightlease took responsibility for the remaining 20 aircraft.

41.    In the Split Agreement, GATX and Flightlease also agreed that they would separately negotiate new agreements with Airbus to replace the AI Purchase Agreement.  The Split Agreement allocated the total PDPs that GFAC had paid to Airbus between Flightlease and GATX as follows:

> "The total amount of predelivery payments presently on deposit with Airbus total USD 227,637,864.  The agreed split between GATX & [Flightlease] of this amount is USD 77,834,754 for GATX's account and USD 149,803,110 for [Flightlease's] account to be applied respectively to the purchase of Aircraft in the new GATX and the new [Flightlease] purchase agreements to replace the existing Purchase Agreement to be agreed with Airbus."

The Split Agreement also provided that "while this split in responsibilities [set forth herein] addresses all the Aircraft contained in the [AI Purchase Agreement], the parties recognize that, through separate negotiations with Airbus, their new final agreements with Airbus may vary in

1  both the models within a family that they choose and the scheduled delivery dates." Neither Airbus

2  nor GFAC, however, was a party to the Split Agreement.

3        42.    Each of Airbus, Flightlease and GATX knew and understood that before any

4  new agreements between Airbus and Flightlease and between Airbus and GATX, respectively,

5  could come into effect, the AI Purchase Agreement would have to be discharged or terminated with

6  
7  the agreement of Airbus and GFAC. That this was understood by Airbus is demonstrated by the

8  terms of a September 5, 2001 "Memorandum of Understanding for the purchase of six (6) A340-

9  300 Aircraft by Flightlease" (the "September 5 MoU").   The September 5 MoU, which was

10  prepared by Airbus but which was never executed by the parties, expressly acknowledges that a

11  termination of the AI Purchase Agreement could only occur subject to new agreements having

12  
13  been signed between Airbus and GATX and Flightlease, respectively.

      43.    Although the Split Agreement states that Flightlease and GATX had decided

14  to "dissolve their joint venture," GFAC was never wound up and/or dissolved officially under

15  Cayman law.  GFAC ceased operations on or about the date of the Split Agreement, but Flightlease

16  
17  and GATX remained bound by the terms of the GFAC Joint Venture Agreement.  When the Split

18  Agreement was executed, GFAC was still a party to the AI Purchase Agreement with Airbus, and

19  the AI Purchase Agreement remained in effect.

20  **GATX's New, Unilateral Contract With Airbus**

21  
22        44.    On October 9, 2001, GATX, GFC and Airbus executed the October 9

23  Agreement.  This was an agreement in principle to execute a new, unilateral aircraft purchase

24  contract.  The new contract between GATX, GFC and Airbus was the October 17 Agreement.  The

25  terms of the October 9 Agreement were negotiated on GATX's behalf by, among others, defendant

26  James Morris, an officer of GFC and a B Director of GFAC, with the knowledge and acquiescence

27  of defendant and GFAC B Director Alan Reinke.  Defendant Morris acted under the direct

28  supervision of GFC employee and GFAC Assistant Secretary Stephen Moulton, and at the

direction and instruction of GFC and GATX.  In negotiating the October 9 Agreement, defendants

Morris and Reinke, by their own admission, considered only GATX's interests and never

considered the best interests of GFAC as separate and distinct from those of GATX.

45.    In the October Agreements, Airbus retained approximately $77 million in

PDPs paid by GFAC under the AI Purchase Agreement and agreed to transfer the funds to GATX's

account under the new aircraft purchase contract.

46.    The October 9 Agreement also memorialized an agreement between GATX,

GFC and Airbus to improperly block any attempt by GFAC to protect its rights under the AI

Purchase Agreement and applicable law.

47.    Section 1.4 of the October 9 Agreement provides, in relevant part, that "each

of GFC and [GATX] agrees not to dispute (and agrees not to procure that GFAC disputes) any

termination of the [AI Purchase Agreement] or any retention by Airbus of PDPs paid by GFAC

under the [AI Purchase Agreement]."  Section 2.1 of the October 9 Agreement requires GFC to

indemnify Airbus for "any amount Airbus is required to pay to GFAC pursuant to any final judicial

determination in reimbursement of PDPs paid by GFAC under the [AI Purchase Agreement]"

under certain circumstances.[3]

48.    After execution of the October 9 Agreement, all defendants took steps to

conceal the terms of the October 9 Agreement from Flightlease.  As a result, Flightlease did not

learn that GATX and GFC had contractually agreed to block GFAC's pursuit of its claims against

Airbus until approximately September 2004.

---

[3]    Section 2.2 of the October 9 Agreement requires GFC to reimburse Airbus in an amount up to
the sum of (i) $77,834,754 plus (ii) any subsequent payments made by GATX, pursuant to
GATX's new contract with Airbus, that relate to "old" aircraft that were previously subject to
the AI Purchase Agreement.

## Airbus's Wrongful Termination of the AI Purchase Agreement

49.     Having obtained the binding commitment of GATX and GFC, through defendants Morris and Reinke, not to have GFAC challenge the termination of the AI Purchase Agreement, Airbus was in a secure position to begin the process of terminating the AI Purchase Agreement and wrongfully retaining the PDPs GFAC paid under the AI Purchase Agreement.

50.     On or about October 3, 2001, Airbus senior vice president Christian Scherer signed a letter (dated October 3, 2001) from Airbus and addressed to GFAC, with copies to Flightlease and GATX (the "October 3 Notice"). The October 3 Notice purported to notify GFAC that it had not paid approximately $7.5 million in PDPs allegedly due on August 1, 2001 and October 1, 2001 (the "October 2001 PDPs"). Significantly, there is no evidence the October 3 Notice was ever sent on October 3, 2001 in accordance with the provisions governing the service of notices set forth in Section 22.1 of the AI Purchase Agreement. (These and related provisions are discussed in more detail below).

51.     There is no evidence Flightlease was ever asked to make a capital contribution to fund payment by GFAC of the October 2001 PDPs, in accordance with the normal practice and course of performance of Airbus and GFAC under the AI Purchase Agreement. At this time, Airbus was aware of the negotiations between Flightlease and GATX and the intention of both to enter into new aircraft purchase agreements with Airbus and appeared to be content to defer collection of the October 2001 PDPs pending the conclusion of these negotiations.

52.     Under these circumstances Flightlease and GATX did not pay capital contributions to GFAC to enable it to pay the October 2001 PDPs. In early October 2001, Flightlease and its subsidiaries had cash or other liquid assets in excess of the amount of Flightlease's share of the October 2001 PDPs. Flightlease could have used these funds to make the requisite capital contributions had it been necessary to pay its share of the October 2001 PDPs. GATX also would have been able to pay its share of the October 2001 PDPs.

53.     On October 9, 2001, after an agreement in principle had been reached between Airbus, GATX and GFC and on the same day the October 9 Agreement was executed, Airbus faxed the October 3 Notice to GFAC.

54.     Pursuant to Section 20.2 of the AI Purchase Agreement, proper service upon GFAC of the October 3 Notice began the running of the 15 business day grace period within which GFAC had to pay the PDPs due under the October 3 Notice.

55.     However, in a second letter to GFAC dated October 11, 2001, Airbus purported to terminate the AI Purchase Agreement. Airbus's purported termination of the AI Purchase Agreement came just eight days after the October 3 Notice was allegedly written and a mere two days after the October 3 Notice was faxed to GFAC (on October 9, 2001).

56.     In the October 11, 2001 letter, Airbus claimed that it was terminating the AI Purchase Agreement as a result of (i) GFAC's failure to pay the October 2001 PDPs; and (ii) unspecified discussions with "senior executives of [GFAC] and its parent companies" during which GFAC allegedly repudiated the AI Purchase Agreement. Airbus also announced its intention to retain all of the $227.6 million in PDPs then paid by GFAC pursuant to Clause 20.5.4 of the AI Purchase Agreement. Noticeably, Airbus did not disclose that it was going to apply approximately $77.8 million of GFAC's PDPs for the credit of GATX in connection with their new contract. Instead, the terms of the new contract between Airbus, GATX and GFC, as well as the contractual obligation of GATX and GFC not to cause GFAC to challenge Airbus's improper termination of the AI Purchase Agreement and obligation to indemnify Airbus upon a successful claim arising out of the termination, were shrouded in secrecy by specific confidentiality clauses.

57.     Airbus never provided any detail, or any support, for its allegation that GFAC "made it clear in [] various conversations" between Airbus and "senior executives of [GFAC] and its parent companies" that GFAC did not "intend[] to fulfill its obligations" under the AI Purchase Agreement. There were no such conversations.

58.     GFAC repeatedly protested Airbus's purported termination and retention of the PDPs and denied having repudiated the AI Purchase Agreement.  GFAC challenged the validity of the service of the October 3 Notice on GFAC and the purported termination itself in a letter to Airbus dated October 31, 2001 that was signed by A Director Peter Gysel and initialed as "read" in advance by defendant B Director James Morris.  In that same correspondence, GFAC also denied ever having repudiated the AI Purchase Agreement and disavowed any alleged repudiation.

59.     After breaching the AI Purchase Agreement and wrongfully retaining GFAC's PDPs, Airbus proceeded to place with third parties certain of the airplanes that were due to be delivered to GFAC pursuant to the AI Purchase Agreement.  Upon information and belief, in placing these airplanes with third parties, Airbus simply credited certain of the GFAC PDPs it had retained against the contemplated purchase price, without any regard for the actual fair market value of the airplanes.

60.     As demonstrated more fully in the paragraphs below, Airbus's purported termination of the AI Purchase Agreement, which was facilitated by defendants, was wrongful and a material breach of the AI Purchase Agreement.  Airbus did not properly serve GFAC with the October 3 Notice of unpaid PDPs pursuant to the AI Purchase Agreement. Airbus also failed to observe the grace periods mandated by the AI Purchase Agreement.

61.     **Service of the Notice of Non-Payment.**  In a letter to Airbus dated October 31, 2001, GFAC noted that it had only received the October 3 Notice by fax on October 9, 2001. The copy of the October 3 Notice faxed to GFAC indicates on its face that it was transmitted to GFAC on October 9, 2001.

62.     In a return letter dated November 15, 2001, Airbus did not claim to have sent the October 3 Notice to GFAC on October 3.  Instead, Airbus claimed to have delivered it to GATX-appointed B Director, defendant James Morris.  Upon information and belief, there is no

1  other support that Airbus in fact delivered the letter to defendant Morris or any other director or

2  representative of GFAC on October 3, 2001.

3          63.     Even if Airbus had delivered the October 3 Notice to defendant Morris,

4  Airbus's personal delivery to defendant Morris would not constitute proper service of the October 3

5  Notice under the AI Purchase Agreement.[4]  As defendants Morris and Reinke have acknowledged,

6  Morris was not explicitly authorized to receive notices on behalf of GFAC under the AI Purchase

7  Agreement.

8

9          64.     Section 22.1 of the AI Purchase Agreement provides that notices between

10 the parties must be delivered by (1) personal delivery to an "authorised representative;" (2) by

11 "registered mail (return receipt requested);" or (3) by "telex."  Copies of all notices exchanged

12 between Airbus and GFAC must also be sent to Flightlease and GATX under the Agreement.

13         65.     Though "authorised representative" is not a defined term in the AI Purchase

14 Agreement, GFAC listed the Manager as the entity to receive notices on its behalf, with copies in

15 all cases to GATX and Flightlease.  Upon information and belief, GFAC had not designated any

16 other "authorised representative" to receive notices on its behalf.  Therefore, even if it occurred,

17 Airbus's purported personal delivery of the October 3 Notice to Morris would not constitute proper

18 service pursuant to the AI Purchase Agreement.

19         66.     **Timing of the Purported Termination.**  GFAC's October 31, 2001 letter to

20 Airbus notified Airbus that it had "totally ignored the grace periods provided by the [AI Purchase

21 Agreement]."  The earliest possible date GFAC could have received the October 3 Notice was, of

22 course, October 3, 2001.  Even if GFAC had received the October 3 Notice on that date -- which it

23 did not -- Airbus could not have validly terminated the AI Purchase Agreement pursuant to its

24 terms until 15 business days thereafter.  Instead, the October 3 Notice was not provided to GFAC

25

26

27

28

---

[4]     If defendant Morris in fact received the October 3 Notice from Airbus, he breached his
fiduciary duties to GFAC by failing to notify the other GFAC directors or take any other action
with respect to the October 3 Notice.

until October 9, 2001. As a result, Airbus could not have validly terminated the AI Purchase

Agreement until at least 15 business days after that date.

67.     In contemporaneous correspondence, Airbus conceded that its purported

termination of the AI Purchase Agreement violated the 15 business day grace period mandated by

Section 20.2 of the Agreement. Indeed, in a letter to GFAC dated November 15, 2001, Airbus

acknowledged that it had "cancell[ed] and terminat[ed] . . . the Agreement within the 15 business

day grace period provided by Clause 20.2 thereof . . . "

68.     Nonetheless, in the November 15, 2001 letter, Airbus continued to justify its

breach of the AI Purchase Agreement by alleging that GFAC had repudiated the Agreement.

GFAC repeatedly denied this allegation. For example, on December 10, 2001, GFAC wrote to

Airbus that it was "not aware of any discussion or conduct on the part of any of the representatives

of this company that could give rise to any [inference] of repudiation."

69.     Upon information and belief, GFAC never repudiated the AI Purchase

Agreement.

## DEMAND IS EXCUSED

70.     Flightlease has not made any formal demand upon the B Directors to pursue

GFAC's claims in this action because the B Directors are defendants herein. As a result, such a

demand would be completely futile.

71.     As described above, defendants Morris and Reinke breached their fiduciary

duties to GFAC when Morris, among others, with the knowledge and acquiescence of Reinke, and

under the direct supervision of GFC employee and GFAC Assistant Secretary Stephen Moulton,

negotiated the October 9 Agreement with Airbus on behalf of GATX and GFC. Acting at the

express direction and instruction of GATX and GFC, defendants Morris and Reinke breached their

fiduciary duties to GFAC.

72.     GATX and GFC's pledge in the October 9 Agreement (i) not to dispute Airbus's termination of the AI Purchase Agreement and its retention of GFAC's PDPs, (ii) not to procure that GFAC disputes Airbus's termination of the AI Purchase Agreement and retention of GFAC's PDPs, and (iii) to repay Airbus more than approximately $77.8 million in the event of a judicial determination requiring Airbus to reimburse GFAC at least that amount in respect of GFAC PDPs, was negotiated on behalf of GATX and GFC, upon information and belief, by defendant James Morris, among others, as part of GATX and GFC's improper side deal with Airbus.  Morris's negotiation of the October 9 Agreement, under the direct supervision of Mr. Moulton, facilitated Airbus's ultimate breach of the AI Purchase Agreement and led to Airbus's retention of approximately $227.6 million in PDPs by GFAC.

73.     Defendants also breached their fiduciary duties to GFAC by initially obstructing GFAC's pursuit of its claims against Airbus.

74.     Defendants Morris and Reinke are employees of GFC, GATX's parent company.  As such, both Morris and Reinke owe fiduciary duties to GFC as well as to GFAC. Both were appointed to the GFAC board of directors by GATX.  Both are employees of GFC and, upon information and belief, have been employees of GFC at all times relevant to this Complaint. Indeed, defendant Morris is managing director of GATX Air, a division of GFC.  Both Morris and Reinke's salaries are paid by GFC.

75.     In direct opposition to the best interests of GFAC, defendants GFC and GATX have a direct financial interest in GFAC's not pursuing its claims against Airbus arising from Airbus's breach of the AI Purchase Agreement, because each of GATX and GFC contracted with Airbus in the October 9 Agreement that each (a) will not cause GFAC to bring such claims, and (b) will indemnify Airbus in the event of any recovery against Airbus pursuant to such claims in certain circumstances.

76.     GFC and GATX's interest in blocking GFAC's pursuit of its valuable claims against Airbus is clear.  If defendants procured GFAC to pursue the claims, GFC and GATX would be in breach of the October 9 Agreement with Airbus.  If GFAC's claims against Airbus were successful, GFC would be required to indemnify Airbus against any such recovery that triggered the indemnification provisions in the October 9 Agreement.

77.     Hence, defendants Morris and Reinke have a fundamental conflict of interest: if they vigorously pursue GFAC's claims against Airbus, they act to the detriment of their employer and in violation of their fiduciary duties to GFC; if they fail to vigorously pursue the claims, they violate their fiduciary duties to GFAC.  As a result, defendants resisted the Joint Liquidators' initial efforts to pursue GFAC's claims against Airbus.

78.     After execution of the October 9 Agreement, all defendants took steps to conceal the terms of the October 9 Agreement.  Flightlease therefore did not learn that GATX and GFC had contractually agreed to block GFAC's pursuit of its claims against Airbus until approximately September 2004.

79.     In addition, after their appointment, the Joint Liquidators sought appointment as Liquidators of GFAC by the Grand Court of the Cayman Islands in order to ensure the prosecution of GFAC's claims.  GATX opposed that effort, in part by filing a "strike out application," which is substantially similar to a motion to dismiss in the United States.  The Cayman Court subsequently granted the strike-out application.  The Cayman Court's ruling is without prejudice to the Joint Liquidator's ability to file a further Cayman Petition or appeal the Cayman Court's Order.

80.     Defendants did not take any action to advance GFAC's interests and pursue GFAC's claims against Airbus until the Joint Liquidators filed a complaint against Airbus, derivatively on behalf of GFAC, in the Supreme Court for the State of New York, County of New York, on September 30, 2005.  That same day, defendants Morris and Reinke authorized the filing

of a complaint by GFAC in the same court, asserting substantially identical claims against Airbus. Defendants filed their complaint on October 10, 2005. In taking these steps defendants have acknowledged the validity of GFAC's claims against Airbus. These claims exist in part as a result of defendants' own actions. Under these circumstances, prosecution of GFAC's claims by defendants Morris and Reinke would not adequately protect the interests of GFAC for at least the following reasons.

81.    First, defendants Morris and Reinke lack the resources to vigorously prosecute GFAC's claims against Airbus. In the event defendants were to retain counsel on a contingency fee basis, any recovery by GFAC's estate obviously would be reduced by the amount of any such fee.

82.    Second, all defendants are deeply conflicted.

83.    Defendants GFC and GATX have a lucrative and valuable ongoing commercial relationship with Airbus. Defendants have a strong disincentive to disrupt that vital commercial relationship.

84.    Defendants Morris and Reinke also have a strong disincentive to vigorously prosecute GFAC's claims against Airbus. Both are employees of GFC and owe fiduciary duties to GFC. In turn, GFC agreed, in the October 9 Agreement negotiated by Morris with the knowledge and acquiescence of Reinke, to indemnify Airbus in certain circumstances for any amount Airbus is required to pay GFAC in respect of PDPs credited by Airbus to GATX's account in connection with the improper termination of the AI Purchase Agreement.

85.    As a result of defendants' inherent conflict, defendants have indicated they have no intention of seeking recovery from Airbus of the approximately $77 million in GFAC PDPs that were improperly taken by GATX pursuant to the October Agreements. Defendants have indicated they do not intend to seek recovery of the $77 million in GFAC PDPs despite the fact that the October 9 Agreement expressly recognizes that GFAC is entitled to recover the full $227.6

million in GFAC PDPs improperly retained by Airbus, including the $77 million in PDPs taken by GATX, in the event Airbus improperly terminated the AI Purchase Agreement. As explained herein above, Airbus admittedly failed to follow the notice requirements of the AI Purchase Agreement in issuing the October 11, 2001 termination letter and had no lawful excuse for doing so. As a result, Airbus improperly terminated the AI Purchase Agreement and all PDPs should be returned to GFAC by Airbus and/or by GATX and GFC.

### FIRST CLAIM FOR RELIEF
### (Breaches of Fiduciary Duties by Defendants Morris and Reinke)

86.    Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

87.    As B Directors of GFAC at all relevant times herein, defendants owed fiduciary duties to GFAC, including duties of reasonable care, loyalty and good faith.

88.    Defendants breached their fiduciary duties to GFAC when defendant Morris, with the knowledge and acquiescence of defendant Reinke, helped negotiate the October 9 Agreement between GFC, GATX and Airbus in utter disregard of his fiduciary duties to GFAC. Pursuant to the October Agreements, Airbus retained certain PDPs paid by GFAC under the AI Purchase Agreement, and Airbus and GATX agreed to block any attempt by GFAC to protect its rights under the AI Purchase Agreement and applicable law.

89.    Defendants also breached their fiduciary duties by obstructing GFAC's pursuit of its claims against Airbus.

90.    As a direct and foreseeable result of these breaches of fiduciary duties, GFAC has suffered damages, including, but not necessarily limited to, the loss of approximately $227.6 million in PDPs, or such other amount as Plaintiff may prove at trial, but in any event in an amount well in excess of $75,000.

## SECOND CLAIM FOR RELIEF
### (Knowing and/or Dishonest Assistance of Breaches of Fiduciary Duties by Defendants GATX and GFC)

91.     Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

92.     At all relevant times defendants Morris and Reinke were employees of GFC, GATX's parent company, and owed fiduciary duties to GFC.

93.     Defendants Morris and Reinke acted at the express direction and instruction of GFC and GATX in negotiating the October 9 Agreement between Airbus, GFC and GATX. Defendants' negotiation of the October 9 Agreement, in utter disregard of their fiduciary duties to GFAC, facilitated Airbus's ultimate breach of the AI Purchase Agreement and led to Airbus's retention of approximately $227.6 million in PDPs by GFAC.

94.     In the October Agreements, GATX appropriated approximately $77 million of the approximately $227.6 million in PDPs paid by GFAC under the AI Purchase Agreement for its own account under a new aircraft purchase contract with Airbus, causing these funds to be unavailable for distribution by GFAC.

95.     After execution of the October 9 Agreement, GATX and GFC took steps to conceal the terms of the October 9 Agreement.  As a result, Flightlease did not learn that GATX and GFC had contractually agreed to block GFAC's pursuit of its claims against Airbus until approximately September 2004.

96.     As a direct and foreseeable result of defendants' knowing and/or dishonest assistance of the aforementioned breaches of fiduciary duties, GFAC has suffered damages, including, but not necessarily limited to, the loss of approximately $227.6 million in PDPs, or such other amount as Plaintiff may prove at trial, but in any event in an amount well in excess of $75,000.

### THIRD CLAIM FOR RELIEF
### (Conspiracy by All Defendants)

97.     Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

98.     All defendants conspired to deprive GFAC of assets and to improperly advance the interests of GATX and GFC at the expense of GFAC.

99.     In negotiating the October 9 Agreement between Airbus, GFC and GATX, defendants Morris and Reinke acted at the express direction and instruction of GFC and GATX and in utter disregard of their fiduciary duties to GFAC.

100.    In the October Agreements, GATX misappropriated approximately $77 million of the approximately $227.6 million in PDPs paid by GFAC under the AI Purchase Agreement for its own account under a new aircraft purchase contract with Airbus, causing these funds to be unavailable for distribution by GFAC.  GATX, GFC and Airbus also agreed to improperly block any attempt by GFAC to protect its rights under the AI Purchase Agreement and applicable law.

101.    After execution of the October 9 Agreement, GATX and GFC took steps to conceal the terms of the October 9 Agreement.

102.    As a direct and foreseeable result of defendants' conspiracy, GFAC has suffered damages, including, but not necessarily limited to, the loss of approximately $227.6 million in PDPs, or such other amount as Plaintiff may prove at trial, but in any event in an amount well in excess of $75,000.

### FOURTH CLAIM FOR RELIEF
### (Unjust Enrichment by GATX)

103.    Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

104.   In the October Agreements, GATX misappropriated approximately $77 million of the approximately $227.6 million in PDPs paid by GFAC under the AI Purchase Agreement for its own account under a new aircraft purchase contract with Airbus, causing these funds to be unavailable for distribution by GFAC.

105.   As a result, GATX has been improperly enriched in the amount of approximately $77 million, or such other amount as Plaintiff may prove at trial, but in any event in an amount well in excess of $75,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that a judgment be granted as follows:

(1)   On its First, Second and Third Claims for Relief, for damages, including, but not necessarily limited to, the loss of approximately $227.6 million in PDPs, or such other amount as Plaintiff may prove at trial, but in any event in an amount well in excess of $75,000, and interest thereon;

(2)   On its Fourth Claim for Relief, for damages, including, but not necessarily limited to, the loss of approximately $77 million in PDPs, or such other amount as Plaintiff may prove at trial, but in any event in an amount well in excess of $75,000, and interest thereon;

(3)   For reasonable attorneys' fees and costs of suit incurred herein; and

(4)   For such other and further relief as the Court deems just and proper.

1  Dated:  October 14, 2005
            San Francisco, California
2

3                                        SKADDEN, ARPS, SLATE
                                         MEAGHER & FLOM LLP
4

5                                  By:_____
                                         Kurt Ramlo (Cal. Bar No. 166856)
6                                        300 South Grand Avenue
                                         Suite 3400
7                                        Los Angeles, California 90071-3144
                                         Telephone: (213) 687-5000
8                                        Facsimile: (213) 687-5600

9                                        Attorney for Plaintiff

10               **DEMAND FOR TRIAL BY JURY**

11          Plaintiff demands a trial of this action by jury.

12  Dated:  October 14, 2005
            San Francisco, California
13

14                                       SKADDEN, ARPS, SLATE
                                         MEAGHER & FLOM LLP
15

16                                 By: _*Kurt Ramlo /se*_
                                         Kurt Ramlo (Cal. Bar No. 166856)
17                                       300 South Grand Avenue
                                         Suite 3400
18                                       Los Angeles, California 90071-3144
                                         Telephone: (213) 687-5000
19                                       Facsimile: (213) 687-5600

20                                       Attorney for Plaintiff

21  Of Counsel:
    J. Gregory St. Clair
22  Shawn P. Naunton
    Four Times Square
23  New York, New York 10036
    (212) 735-3000
24       - and –
    Edward J. Meehan
25  1440 New York Avenue, N.W.
    Washington, D.C. 20005
26  (202) 371-7000

27

28

STEPHEN JOHN AKERS deposes and states:

I am a partner of Grant Thornton UK LLP, a leading financial and business adviser with registered offices located at Grant Thornton House, Melton Street, Euston Square, London NW1 2EP, United Kingdom. I was certified as Joint Liquidator of Flightlease (Holdings) Guernsey Limited, the plaintiff in this action, by Order of the Royal Court of Guernsey, Ordinary Court, dated May 5, 2004. I have read the foregoing Shareholder Derivative Complaint and know its contents. The Shareholder Derivative Complaint is true to my knowledge, except as to matters alleged on information and belief, and as to those matters, I believe it to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 14, 2005.

_____
Stephen John Akers

Verification of Shareholder Derivative Complaint